T.C. Summary Opinion 2007-17


UNITED STATES TAX COURT


OTIS L. PIMPLETON AND TABITHA PIMPLETON, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 21523-05S.                    Filed January 30, 2007.


Otis L. Pimpleton, pro se.

<u>Derek W. Kaczmarek</u>, for respondent.


ARMEN, <u>Special Trial Judge</u>:  This case was heard pursuant to the provisions of section 7463 of the Internal Revenue Code in effect when the petition was filed.[1]  The decision to be entered

_____

    [1]  Unless otherwise indicated, all subsequent section references are to the Internal Revenue Code in effect for 2002, the taxable year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

is not reviewable by any other court, and this opinion should not be cited as authority.

Respondent determined a deficiency in, and an accuracy-related penalty under section 6662(a) on, petitioners' Federal income tax for 2002 in the amounts of $2,355 and $244.60, respectively.

After concessions by the parties,[2] the issue for decision by the Court is whether petitioners underreported on their income tax return for 2002 tips received by petitioner Otis L. Pimpleton during that year.

Whether petitioners are entitled to the additional child tax credit as claimed on their return is purely a mechanical matter.

### Background

Some of the facts have been stipulated, and they are so found.

At the time that the petition was filed, Otis L. Pimpleton (petitioner) and Tabitha Pimpleton (collectively, petitioners) resided in Las Vegas, Nevada.

---

[2] Petitioners concede that petitioner Tabitha Pimpleton received unemployment compensation during 2002 in the amount of $3,867, which was not reported on their income tax return for that year. Respondent concedes that $580 of Federal income tax was withheld from such unemployment compensation, which tax was not claimed by petitioners on their return. Respondent also concedes, for technical reasons, that petitioners are not liable for the accuracy-related penalty under sec. 6662(a).

Petitioner's Employment at the Las Vegas Hilton

Since 1987, petitioner has been employed by the Las Vegas Hilton in Las Vegas, Nevada.  During 2002, the taxable year in issue, petitioner was classified by the Las Vegas Hilton as a room service food server, and he worked in that capacity at least 30 hours a week throughout the year.

As a room service food server, petitioner was responsible for a combination of hospitality and standard room service functions.

Room Service Function

Petitioner worked the day shift at the Las Vegas Hilton, which began at 4 a.m. and ended at 12 p.m., and he was assigned to a section of the room service department known as "express breakfast", where he was responsible for delivering continental breakfasts, as well as individual breakfast items such as coffee, tea, juice, and pastry, to hotel guests in their rooms.  The most expensive item, a complete continental breakfast, cost $11 per person.

Upon each delivery, petitioner would present the check, which included a flat service charge of $2 per person.  The service charge went to the hotel and not to the food server. Generally, guests would pay by signing the check and thereby authorize a charge to their credit card, which was on file with the hotel.

The Las Vegas Hilton did not mandate that petitioner be tipped a specified percentage but left the matter to each guest's discretion. Guests who paid by credit card would almost invariably add gratuity to the check rather than tip in cash. The relatively few guests who paid in cash would also tip in cash.

Petitioner almost always received a tip, except from those guests who were not familiar with the custom of tipping.

Hospitality Function

When engaged in the hospitality function, petitioner would be responsible for serving breakfast parties or brunches to organized groups of people. In contrast to the room service function, the Las Vegas Hilton would include a gratuity on the check for the hospitality function.[3]

When engaged in the hospitality function, petitioner's work day might extend into the early afternoon.

"Tip-Outs"

Petitioner did not pool or share his tips with other Las Vegas Hilton employees. However, he did pay his bussers, consistent with local custom, a flat amount of $4 for each day that he worked.

---

[3] The record does not reveal the percentage tip rate used by the Las Vegas Hilton for the hospitality function.

Payment of Charged Tips and Wages by the Las Vegas Hilton

Petitioner received a paycheck biweekly from the Las Vegas Hilton. Petitioner's paycheck would reflect his hourly wage plus his gratuity from the hospitality function.

In contrast, at the end of each work day, petitioner would receive, in cash from the hotel's cashier, his tips from the room service function that had been charged by guests to their credit cards.

Tip Compliance Agreement

For a number of years, specifically including the taxable year 2002, a tip compliance agreement has been in effect between the Las Vegas Hilton and the Internal Revenue Service.

Tip compliance for room service food servers at the Las Vegas Hilton is a percentage of sales by the employee. For 2002, the agreed-upon rate was 15.4 percent, to be applied against an employee's sales on a daily basis.

The payroll manager of the Las Vegas Hilton implements the tip compliance agreement as follows:

> Our room service food servers work a combination of
> hospitality functions and standard room service
> functions on a daily basis. With a hospitality
> function a gratuity is included on the guest's bill and
> is paid out to the food server on his biweekly
> paycheck. For the standard room service function,
> gross sales are accumulated by [an] employee throughout
> the day. The 15.4% of sales is calculated and posted
> to the employee's paycheck at the end of each pay
> period. Those employees on tip compliance have a
> combination of percentage of sales and hospitality
> gratuity posted to their paychecks each pay period.

For those employees not on compliance the hospitality gratuity is posted to their paychecks biweekly; however, they do not have the percentage of sales for the standard room service functions posted to their checks. It then becomes the employee's responsibility to declare tips received from these sales.

Room service food servers can elect to participate in the tip compliance agreement. Petitioner did not choose to do so for 2002.[4]

Petitioner's Net Sales

Petitioner's net sales for 2002 from the room service function were $61,427.78.[5]

Petitioner's Form W-2 and Tax Return

Petitioner received a Form W-2, Wage and Tax Statement, from the Las Vegas Hilton for 2002. The Form W-2 reported wages of $21,658 and tips of $5,153, for total compensation of $26,811. Petitioners included this latter amount, along with petitioner Tabitha Pimpleton's wages, on line 7 of their timely filed income tax return.

Respondent's Deficiency Determination

In the notice of deficiency, respondent determined that petitioner underreported his tips for 2002 by $4,275. Respondent determined this amount by subtracting reported tips of $5,153

---

[4] Petitioner has since elected to participate in the tip compliance program.

[5] So stipulated.

(per petitioner's Form W-2) from tips derived from petitioner's sales from the room service function. Respondent calculated the latter amount by multiplying petitioner's net sales ($61,427.78) by a tip rate of 15.4 percent and then subtracting an amount ($147) that appears to reflect "tip-outs"; i.e., the amount paid by petitioner to his bussers.[6]

## Discussion

We begin with a number of well-established principles. First, there is no question that tips constitute compensation for services and are includable in gross income under section 61(a). Catalano v. Commissioner, 81 T.C. 8, 13 (1983), affd. without published opinion sub nom. Knoll v. Commissioner, 735 F.2d 1370 (9th Cir. 1984); Meneguzzo v. Commissioner, 43 T.C. 824, 831 (1965); Sec. 1.61-2(a)(1), Income Tax Regs.

Second, all taxpayers are required to maintain records sufficient to determine their correct tax liability. Sec. 6001; Meneguzzo v. Commissioner, supra at 831-832. When a taxpayer receives tips on a daily basis, he or she is required to keep an accurate and contemporaneous record of such income. Ross v. Commissioner, T.C. Memo. 1989-682, affd. without published

---

[6] The 15.4-percent tip rate was based both on financial data furnished by the room service department of the Las Vegas Hilton (e.g., sales journals and credit card records) and on interviews of department personnel. The determined tip rate reflects a "stiff" rate of 15 percent and a 2-percent discount for tips paid in cash (rather than by credit card).

opinion 967 F.2d 590 (9th Cir. 1992); Biddle v. Commissioner, T.C. Memo. 1989-397; Bruno v. Commissioner, T.C. Memo. 1985-168; sec. 1.6001-1(a), Income Tax Regs.; sec. 301.6053-4, Proced. & Admin. Regs.  Such records must be retained by the taxpayer "so long as the contents thereof may become material in the administration of any internal revenue law."  Sec. 1.6001-1(e), Income Tax Regs.

Third, when a taxpayer fails to keep records, or maintains only incomplete or inadequate records of income, or when a taxpayer's records are no longer available, the Commissioner may recompute tips in any manner that clearly reflects income.  Sec. 446; Mitchell v. Commissioner, 416 F.2d 101 (7th Cir. 1969), affg. T.C. Memo. 1968-137; Petzoldt v. Commissioner, 92 T.C. 661, 686-687 (1989); Meneguzzo v. Commissioner, supra at 831.  The Commissioner has great latitude in adopting a suitable method for reconstructing the taxpayer's income.  Giddio v. Commissioner, 54 T.C. 1530, 1533 (1970); Way v. Commissioner, T.C. Memo. 1990-590.  The amount of income determined by the Commissioner need not be exact so long as it is based on a reasonable methodology.  Meneguzzo v. Commissioner, supra; Schroeder v. Commissioner, 40 T.C. 30, 33 (1963); Kuras v. Commissioner, T.C. Memo. 1980-32.  Both this Court and the Courts of Appeals have accepted the use of formulas in the reconstruction of tip income.  See, e.g., Cracchiola v. Commissioner, 643 F.2d 1383, 1384-1385 (9th Cir.

1981), affg. per curiam T.C. Memo. 1979-3.  Indeed, even statistical surveys have been held to be an appropriate method of computing tip income.  See, e.g., <u>Ross v. Commissioner</u>, <u>supra</u>; cf. sec. 7491(b).

Fourth, the Commissioner's method of recomputing income carries with it a presumption of correctness, and the taxpayer bears the burden of proving it wrong.[7]  <u>INDOPCO, Inc. v. Commissioner</u>, 503 U.S. 79, 84 (1992); <u>Welch v. Helvering</u>, 290 U.S. 111, 115 (1933).

If petitioner maintained contemporaneous records of his tip income for 2002, he did not offer such records at trial.  Rather, petitioner challenges only respondent's methodology in reconstructing the amount of his tip income.

Petitioner's principal challenge focuses on the amount of his net sales.  In this regard, the parties agree that sales should properly be net of sales tax, and the parties assume that the figures furnished by the Las Vegas Hilton are so.  Petitioner contends that sales should also be net of the $2 per person service charge that was levied for the benefit of the hotel and

---

[7]  Although sec. 7491(a) may serve to shift the burden of proof to the Commissioner, that section has no application to the present case in view of the fact that:  (1) Petitioner has not asserted its applicability; (2) petitioner has failed to demonstrate that he maintained the requisite books and records, see sec. 7491(a)(2); and (3) petitioner failed to introduce credible evidence sufficient to establish a prima facie case, see sec. 7491(a)(1).

not for the benefit of the food server.  Respondent agrees.
Further, respondent acknowledges that the record does not
definitively demonstrate whether "net sales" includes the service
charge.[8]  Respondent contends that even if net sales includes the
service charge, then, if net sales were reduced by the service
charge, the tip rate necessarily would be greater than the
determined rate.  We agree with respondent.  The following
example illustrates why:

Assume two guests order full continental breakfasts for $11
each and give a $5 tip.  Ignoring sales tax, as we must, the
total charge is $31 ($22 breakfasts + $4 service fee + $5 tip).
If the $4 service fee is included in net sales, the tip rate is
19.2 percent ($5/$26).  On the other hand, if the $4 service fee
is not included in net sales, the tip rate is greater; i.e., 22.7
percent ($5/$22).

In short, the uncertainty regarding the precise makeup of
net sales does not compromise respondent's determination.  If net
sales does not include the service charge, then petitioner is
content; if net sales does include the service charge, then the
15.4 percent tip rate is understated and a greater tip rate would
be applicable.  As the foregoing example demonstrates, 19.2
percent of $26 is mathematically the same as 22.7 percent of $22.

---

[8]  It should be recalled that respondent based his analysis
on data furnished by the Las Vegas Hilton.

Petitioner also contends that net sales may include room service sales and hospitality sales. However, that contention is contrary to the parties' stipulation that petitioner's net sales from the room service function were $61,427.78. Further, the parties' stipulation appears to be consistent with the underlying exhibit, which specifies "room service" only and not room service and hospitality. In any event, petitioner's contention is unavailing because respondent's deficiency determination is structured as though petitioner's net sales were derived from both the room service function and the hospitality function. In other words, in determining unreported tips, respondent subtracted reported tips of $5,153 (per petitioner's Form W-2) from tips as reconstructed based on petitioner's net sales of $61,427.78 and not based on net sales of some greater amount.

Petitioner also makes various arguments about the physical location of the Las Vegas Hilton and the demographics of the hotel's clientele. However, given the fact that respondent's determination was based on data furnished by the Las Vegas Hilton that was specifically applicable to its room service department, and not on data from other hotels or other departments, petitioner's arguments are unavailing.

Finally, although we are not persuaded by any of petitioner's arguments, we think respondent's reconstruction of petitioner's tip income is deficient in one regard. As previously found, he did not pool or share his tips with other

Las Vegas Hilton employees; however, he did pay his bussers $4 per day.  Respondent appears to have reduced petitioner's tips in order to account for this "bus money".  However, the amount of the reduction ($147) does not seem reasonable in view of the fact that he worked at least 30 hours a week throughout the year.  Although the record does not establish the exact number of days that petitioner worked in 2002, we think that an additional reduction of $653 is reasonable under the circumstances.[9]  See Cohan v. Commissioner, 39 F.2d 540, 543-544 (2d Cir. 1930).

## Conclusion

As previously stated, petitioner did not offer at trial any contemporaneous records of his tip income for 2002.  In the absence of any such records, we have reviewed respondent's methodology in reconstructing petitioner's tip income.  Except for the relatively modest adjustment discussed in the preceding paragraph, we think that respondent's methodology is reasonable.  In any event, petitioner has not shown it to be otherwise.  Accordingly, except as indicated, we sustain respondent's tip income determination.

Reviewed and adopted as the report of the Small Tax Case Division.

---

[9]  Derived as follows: 4 days/week x 50 weeks x $4/day - $147 = $653.

In order to reflect our disposition of the disputed issue, as well as (1) the parties' concessions, see <u>supra</u> note 2, and (2) the allowable amount of the additional child tax credit, see <u>supra</u> p.2,

<u>Decision will be entered</u>

<u>under Rule 155.</u>